Karl Laurence Kirkman v. Commissioner.
Kirkman v. Commissioner
Docket No. 4788-68.
United States Tax Court
T.C. Memo 1970-180; 1970 Tax Ct. Memo LEXIS 179; 29 T.C.M. (CCH) 797; T.C.M. (RIA) 70180; June 29, 1970, Filed Karl Laurence Kirkman, pro se, 13301 Edinburgh Lane, Laurel, Md.R.S. Erickson, for the respondent. 798 STERRETT
Memorandum Findings of Fact and Opinion STERRETT, Judge: The Commissioner determined a deficiency in petitioner's Federal income tax for the calendar year 1965 in the amount of $890.86. The sole issue presented for our decision is whether certain payments were received by petitioner as a "scholarship" or as a "fellowship grant" within the meaning *180 of section 117(a)(1) of the Internal Revenue Code of 1954. [1]
Findings of Fact Some of the facts have been stipulated and the stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. A summary of the salient facts is set forth below. At the time of filing his petition herein, Karl Laurence Kirkman (hereinafter referred to as the petitioner) had his legal residence in Laurel, Maryland. He filed his individual Federal income tax return for the taxable year 1965 with the director of the internal revenue service center, Philadelphia, Pennsylvania. During the year involved herein (1965), petitioner was enrolled in a program of study at Webb Institute of Naval Architecture (hereinafter referred to as Webb Institute), Glen Cove, Long Island, New York. He was a candidate during this period for a bachelor of science degree in naval architecture and marine engineering, which degree he received in June 1965. All undergraduate students at Webb Institute, including petitioner, were given scholarships covering the *181 expenses of tuition, fees, board, lodging, and necessary work materials. Webb Institute students only furnished their own clothing and personal spending money. Each academic year at Webb Institute is divided into four parts. There are two academic semesters, a 10-week "practical work term," and one holiday period. The first academic semester begins the latter part of August and extends to about the middle of December. It is followed by the practical work term. The second academic semester begins about the middle of March and continues for 16 weeks until commencement and the beginning of the holiday period. Satisfactory completion of the 10-week practical work period between the first and second semesters of each academic year is a degree requirement for all Webb Institute students. The usual sequence consists of working as a mechanic in a shipyard the first year; as a cadet in the engine room of a ship the second year; and in a design office as a draftsman or junior engineer the third and fourth years. Students frequently arrange their own work term with private employers not affiliated with the Webb Institute. In cases where potential employers are unfamiliar with the practical *182 work term program, Webb Institute assists students in securing suitable positions and in arranging for compensation at the "going rate" for such activities. Pertinent provisions of a document entitled "Winter Work Instructions" stating the purpose and requirements of the Webb Institute practical work program, which document was issued to the petitioner during his matriculation at Webb Institute, are set forth below: WEBB INSTITUTE OF NAVAL ARCHITECTURE WINTER WORK INSTRUCTIONS I Introduction * * * In order to become a highly competent marine engineer or naval architect it is necessary to be thoroughly familiar with ship construction, terminology, arrangements, and operating practice, both in the deck and engineering departments. Experience indicates that many poor designs are made by designers with an adequate theoretical preparation but with an unfortunate lack of knowledge of current practice, and with no practical experience. The Webb winter work program is designed not only to introduce students to the essential practical phase of their preparation for a professional career, but also to enable them to learn materials which will make their theoretical studies more realistic. *183 Since learning is the primary objective, jobs which will give the best experience should be sought rather than those providing the highest rate of pay. II The Work Term * * * Satisfactory completion of 10 weeks per year is a specific requirement for graduation and the Institute reserves the right to delay or refuse to grant a student's 799 degree if this requirement is not met and there are no mitigating circumstances. * * * VI Special Assignments during Work Period The following special projects will be completed during the work period and submitted not later than the end of the first week of the second semester: 1. Technical Report - all students * * * The technical report will be on 8 1/2 X 11 paper neatly handwritten or typed, using double spacing, and consisting of 900-1000 words. The paper should include the following: (a) General description of work done and assigned responsibilities. (b) Brief comment on working conditions. (c) Important things learned. (d) Suggestions and recommendations. * * * Hydronautics, Inc. (hereinafter referred to as Hydronautics) is a private corporation which has achieved prominence in the field of naval and industrial *184 hydrodynamics. During his senior year (i.e., the period at issue herein) the petitioner successfully fulfilled the practical work term requirements by obtaining employment as a junior research scientist with Hydronautics. The petitioner had previously been employed by Hydronautics during the work term period of his junior year and also during the summer between his junior and senior years in college. He subsequently became a full-time employee at Hydronautics upon his graduation from Webb Institute in June of 1965. Hydronautics has neither a written nor an oral agreement with Webb Institute regarding work term arrangements. However, Hydronautics informed Webb Institute that it would like to have practical work term students if they were available. The officers of Hydronautics were familiar with the practical work term requirements instituted by Webb Institute because its professional staff included several Webb graduates. From the standpoint of Hydronautics, the primary purpose for hiring Webb Institute students during the 10-week practical work term was to evaluate their potential as future full-time employees. Hydronautics considered Webb Institute an excellent source of employees *185 and desired to maintain good relations with the school. During its 10-year history up to the time of trial, Hydronautics had employed approximately 7 or 8 practical work term students. Of these, only petitioner and one other practical work term student subsequently returned to Hydronautics as permanent full-time employees. Petitioner made no agreement with Hydronautics as a condition of his winter work term to return as a full-time employee after graduation. Webb Institute does not participate in any way in the supervision or control of its students while they are employed by Hydronautics during the winter practical work term. Hydronautics has complete authority to prescribe the duties of its practical work term students. While employed at Hydronautics during the winter practical work term of his senior year, petitioner performed a variety of functions under the supervision of Hydronautics personnel. These functions were to some extent useful to Hydronautics. Although petitioner was permitted to work on his thesis during the winter practical work term at issue, he had to obtain the permission of a Hydronautics officer to do so, and his work on the thesis was not allowed to conflict *186 with the needs of Hydronautics. During his 10-week winter work term employment with Hydronautics during 1965, petitioner received regular payments by check contemporaneous with the payment by Hydronautics of all employee wages. Such payments were commensurate with the "going rate" then being paid by industry to students. Hydronautics withheld Federal withholding and social security taxes from the payments to petitioner. These payments were denominated as payroll on Hydronautic's corporate books and deducted on its Federal income tax return as salary and wage expense. The payments made by Hydronautics to petitioner were computed on an hourly basis. He was paid only for those hours he worked and was paid overtime for any additional hours. Hydronautics did not intend to pay for petitioner's schooling and did not view the payments in question as either a gift or a scholarship. The payments to petitioner were handled and treated in the same manner as wages paid to any other Hydronautics part or fulltime employee. When petitioner left Hydronautics to return to school at the end of the winter work term in 1965, the payments from Hydronautics were terminated and he received no further *187 financial assistance from Hydronautics while attending Webb Institute. Petitioner did not replace a regular 800 Hydronautics employee and was not replaced after returning to school. Petitioner received a raise or increase in salary for each of the three separate periods during which he was employed by Hydronautics. Although petitioner was made a member of the company group life and medical insurance policies while a student-employee at Hydronautics, he was not eligible for pension, salary continuation, vacation, sick leave, or emergency leave. Upon becoming a full-time employee at Hydronautics following his graduation from Webb Institute, petitioner received additional compensation and other benefits as a result of his prior work experience as a part-time employee. Petitioner timely filed his Federal income tax return for the taxable year 1965 with the director of the internal revenue service center, Philadelphia, Pennsylvania, showing a liability in the amount of $890.86, which amount was duly paid and assessed. On April 7, 1966, petitioner filed a claim for refund in the amount of $1.00 or more with the district director of internal revenue, Baltimore, Maryland, on the basis *188 that payments received and reported as taxable income on his 1965 income tax return in fact represented a scholarship or fellowship grant excludable from gross income under section 117 of the Internal Revenue Code of 1954. On February 3, 1967, the assessment of $890.86 was abated and said amount, plus interest in the amount of $41.84, was refunded to petitioner. The Commissioner subsequently issued a statutory notice asserting a deficiency in the amount of $890.86, which notice contained the following explanation: The issue raised in your claim for refund requesting an exclusion from income of a portion of the compensation received from Hydronautics, Inc. under the provisions of Section 117(a) of the Internal Revenue Code has been given careful consideration and it has been determined that the claim is not allowable because you have failed to establish that any portion received is excludable as a scholarship or fellowship grant. Therefore, this income is includable in gross income under the provisions of Section 61 of the Internal Revenue Code. Since petitioner had intended to exclude from gross income as a scholarship *189 or fellowship grant only those payments received during the 10-week period while at Hydronautics, the Mid-Atlantic Service Center received two separate checks from petitioner in the amount of $488.20 ($473.49 plus interest of $14.71) on February 14, 1967, and $444.50 ($417.37 plus interest of $27.13) on February 13, 1967. Petitioner remitted the $44.50 payment only as an advance deposit pending a resolution of the pending case here involved. Neither the payment of $488.20 nor the payment of $444.50 has been reassessed as tax and interest. Petitioner's payments have been held as advance deposits pending the outcome of the instant case. Opinion This case presents for our decision the familiar question of whether certain amounts received by the petitioner are excludable from his gross income as a "scholarship" or a "fellowship grant" within the meaning of section 117(a)(1), [2] or alternatively whether such amounts constitute compensation for services includable in the petitioner's gross income under section 61(a)(1). [3] Petitioner contends that the payments at issue herein qualify as a non-taxable "scholarship" or "fellowship grant"; whereas, respondent advances the position that *190 such payments represent taxable compensation to the petitioner. We agree with the respondent. It is well settled that before the exclusionary provisions of section 117 become operative, it must first be established "that the payment sought to be excluded has the normal characteristics associated with the term 'scholarship'." Elmer L. Reese, Jr., 45 T.C. 407, 413 (1966), affirmed per curiam 373 F. 2d 742 (C.A. 4, 1967). See also Edward A. Jamieson, 51 T.C. 635, 638 (1969) and Stephen L. Zolnay, 49 T.C. 389, 396 (1968). Although the terms "scholarship" *191 and "fellowship grant" are not defined in the Code, such terms are defined, albeit rather generally, in 801 respondent's regulations.[4] In Bingler v. Johnson, 394 U.S. 741, 751 (1969), the Supreme Court approved the definitions contained in these regulations by stating that they "are prima facie proper, comporting as they do with the ordinary understanding of 'scholarships' and 'fellowships' as relatively disinterested, 'no-strings' educational grants, with no requirement of any substantial quid pro quo from the recipients." Section 1.117-4(c), Income Tax Regs., expressly excludes from the definition of "scholarship" and "fellowship grant" amounts representing "compensation for past, present, or future employment services" and amounts paid to an individual "to enable him to pursue studies or research primarily for the benefit of the grantor." With respect to this regulation, the Supreme Court in Bingler v. Johnson, supra, stated, in part, the following at pages 757 and 758: The thrust of the provision. dealing with compensation is that bargained-for payments, given only as a "quo" in return for the quid of services rendered - whether past, present, *192 or future - should not be excludable from income as "scholarship" funds. Careful consideration of the record herein compels us to the conclusion that the payments at issue were given to petitioner by Hydronautics principally as a quo in consideration for the quid of services he rendered while employed by Hydronautics during the 1965 winter work term. The record before us reveals that during the year involved herein (1965) petitioner was enrolled in a program of study at Webb Institute as a candidate for a bachelor of science degree in naval architecture and marine engineering. All Webb Institute students were required to complete satisfactorily a 10-week practical work period between the first and second semesters of each academic year. Petitioner was employed *193 as a junior research scientist with Hydronautics, a private corporation in the field of naval and industrial hydrodynamics, during the 1965 practical work period. Webb Institute did not participate in any way in the supervision of petitioner while he was employed by Hydronautics, and Hydronautics had complete authority to prescribe petitioner's duties and supervise his work during the practical work term period. During the 10-week practical work period, petitioner received regular payments by check contemporaneous with the payment by Hydronautics of all employee wages. Hydronautics withheld Federal withholding and social security taxes from the payments to petitioner, denominated such payments as payroll on its corporate books, and deducted such payments as salary and wage expense on its Federal income tax return. Dr. Bennett L. Silverstein, vice-president of Hydronautics, testified at the trial of this case that the payments at issue were not intended by Hydronautics to pay for petitioner's schooling, and were not viewed either as a gift or scholarship. These payments were handled and treated by Hydronautics in the same manner as wages paid to any other Hydronautics part or full-time *194 employee. Petitioner was paid on an hourly basis only for the hours he worked at Hydronautics during the practical work term, and the payments ceased as soon as he returned to school at the end of the winter work term in 1965. In view of the foregoing facts and evidence of record, we would be hard pressed not to find the existence of a "substantial quid pro quo" in the case at bar. Consequently, we hold that this case is governed by the principles enunciated in Bingler v. Johnson, supra, and the payments involved herein represent compensation for services includable in petitioner's gross income under section 61(a)(1). Petitioner is to be congratulated on an excellent presentation of his own case without the benefit of legal counsel. The main thrust of petitioner's argument is that the primary purpose of the practical work program was to further petitioner's education and training, rather than to benefit the grantor. See sec. 1.117-4(c)(2), Income Tax Regs.[5] The evidence of record is to the contrary. Petitioner's own witness (Dr. Bennett Silverstein) testified that 802petitioner's services were of some use to Hydronautics, and that the primary purpose of Hydronautics *195 in hiring Webb Institute practical work term students was to evaluate their potential as future full-time permanent employees. All evidence of probative value in the record before us is consistent with this testimony. Petitioner's reliance upon Commissioner v. Ide, 335 F. 2d 852 (C.A. 3, 1964), affirming 40 T.C. 721 (1963); William Wells, 40 T.C. 40 (1963); Chander P. Bhalla, 35 T.C. 13 (1960); and Aileene Evans, 34 T.C. 720 (1960), is misplaced. Those cases are readily distinguishable on their facts from the case at bar on the basis that the study and research activities involved therein did serve the primary purpose of furthering the taxpayer's education and training, and the payments involved therein did not represent compensation for services. *196 In essence, petitioner asks us to equate what might be referred to as "on-the-job training" to the grant of a scholarship or fellowship. To sustain this view would be to emasculate section 117. Accordingly, Decision will be entered for the respondent. Footnotes
1. Unless otherwise designated, all future statutory references will be to the Internal Revenue Code of 1954.↩
2. SEC. 117. SCHOLARSHIPS AND FELLOWSHIP GRANTS. (a) General Rule. - In the case of an individual, gross income does not include - (1) any amount received - (A) as a scholarship at an educational institution (as defined in section 151(e)(4)), or (B) as a fellowship grant, * * * ↩
3. SEC. 61. GROSS INCOME DEFINED. (a) General Definition. - Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items: (1) Compensation for services, including fees, commissions, and similar items;↩
4. § 1.117-3. Definitions. (a) Scholarship. A scholarship generally means an amount paid or allowed to, or for the benefit of, a student, whether an undergraduate or a graduate, to aid such individual in pursuing his studies. * * * * * * (c) Fellowship grants. A fellowship grant generally means an amount paid or allowed to, or for the benefit of, an individual to aid him in the pursuit of study or research. * * *↩
5. In footnote 32 on page 758 of its opinion in Bingler v. Johnson, supra, the Supreme Court accepted the Government's position that the "primary purpose" test contained in paragraph (2) of sec. 1.117-4(c), Income Tax Regs., was merely an adjunct to the "compensation" provision contained in paragraph (1) of such regulations. The Court quoted the approved language from the Government's brief to the effect that while the second paragraph of the regulations supplemented the first by imposing a tax on bargained-for arrangements where an employeremployee relationship was not created, the general philosophy underlying both paragraphs was the same, i. e., the terms "scholarship" and "fellowship" do not include arrangements wherein the taxpayer provides a quid pro quo in return for money. Under this view, the petitioner herein would be taxable under either paragraph of the sec. 1.117-4(c)↩ regulations since we have found that he did in fact provide a quid pro quo in return for the payments at issue.